UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DENNIS J. DONOGHUE,

                    Plaintiff,

          -v.-

Y-MABS THERAPEUTICS, INC.,

                    Nominal
                    Defendant,

          -and-

THOMAS GAD,

                    Defendant.

---

21 Civ. 7182 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

On March 3, 2021, Defendant Thomas Gad ("Defendant"), through his business entity GAD Enterprises, LLC ("GAD Enterprises"), entered into an exchange agreement with nonparty WG Biotech ApS ("WG Biotech").  Pursuant to that agreement, on March 10, 2021, Defendant conveyed 20,565 shares of WG Biotech back to WG Biotech, and WG Biotech conveyed 1,029,927 shares of the common stock of Nominal Defendant Y-mAbs Therapeutics, Inc. ("Y-mAbs") to Defendant.  At the time of this exchange, the fair market value of Y-mAbs stock was $35.30 per share.

Plaintiff Dennis J. Donoghue ("Plaintiff") asserts that, in the six-month periods prior to and following March 10, 2021, Defendant sold a total of 212,000 shares of Y-mAbs common stock on the public market at prices higher than $35.30 per share.  According to Plaintiff, through these sales, Defendant realized over $2,543,000 in so-called "short-swing" profits.  Plaintiff brought

the instant action pursuant to Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b), otherwise known as the "short-swing profit rule," which requires insiders to forfeit any trading profit earned from buying and selling a company's stock within a six-month period.  Plaintiff seeks disgorgement of Defendant's alleged short-swing profits for the benefit of Y-mAbs.

Earlier in this case, Defendant moved to dismiss the Complaint and the Court denied the motion, concluding that certain factual information proffered by Defendant was not then properly before the Court.  That information is now before the Court, in the context of the parties' cross-motions for summary judgment.  For the reasons that follow, the Court grants Defendant's motion for summary judgment in full and denies Plaintiff's cross-motion for the same.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

Plaintiff Dennis J. Donoghue is a shareholder of Y-mAbs.  (Pl. 56.1 ¶ 1). Deborah Donoghue ("Original Plaintiff"), his late wife, was formerly the named

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with their respective motions for summary judgment.  The Court primarily sources facts from Defendant's Statement of Material Facts Pursuant to Local Rule 56.1 (each a "Rule 56.1 Statement") (Dkt. #104 ("Def. 56.1")), submitted in connection with his motion for summary judgment, as well as Plaintiff's Rule 56.1 Statement (Dkt. #109 ("Pl. 56.1")), submitted in connection with his motion for summary judgment; the Declaration of Amanda B. Asaro (Dkt. #105 ("Asaro Decl.")), and the exhibits attached thereto ("Asaro Decl., Ex. []"); the Declaration of Thomas Gad (Dkt. #106 ("Gad Decl.")), and the exhibits attached thereto ("Gad Decl., Ex. []"); and the Affirmation of Miriam Tauber (Dkt. #108 ("Tauber Aff.")), and the exhibits attached thereto ("Tauber Aff., Ex. []").

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in a movant's Rule 56.1 Statement is

plaintiff in this action.  (*See* Dkt. #43).  Following Deborah Donoghue's death during the pendency of this litigation, Plaintiff (the Administrator with Limitations of her non-probate estate) was substituted in as named plaintiff. (*See* Dkt. #57; *see also infra* Background Section B).

Defendant Thomas Gad is the founder of Nominal Defendant Y-mAbs, a biopharmaceutical company focused on the development and commercialization of antibody-based therapeutic products for cancer treatments.  (Def. 56.1 ¶¶ 1, 4).  Defendant currently serves as the interim CEO, Head of Business Development, and President of Y-mAbs.  (*Id.* ¶ 2). Defendant is also a member of the Y-mAbs Board of Directors.  (*Id.* ¶ 3).

### 2.    The Shareholders' Agreement

The series of transactions at issue in this case springs from a nexus of natural persons and their associated legal entities that came into being in

---

supported by evidence and controverted only by a conclusory statement by the opposing party, the Court finds that fact to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Where one party agrees to a fact set forth in the other party's Rule 56.1 Statement in its entirety, the Court cites only the other party's Rule 56.1 Statement.

For ease of reference, the Court refers to Defendant's memorandum of law in support of his motion for summary judgment as "Def. Br." (Dkt. #103); to Plaintiff's memorandum of law in support of his motion for summary judgment as "Pl. Br." (Dkt. #110); to Defendant's memorandum of law in opposition to Plaintiff's motion as "Def. Opp." (Dkt. #113); to Plaintiff's memorandum of law in opposition to Defendant's motion as "Pl. Opp." (Dkt. #116); to Defendant's reply memorandum of law in support of his motion as "Def. Reply" (Dkt. #122); to Plaintiff's reply memorandum of law in support of his motion as "Pl. Reply" (Dkt. #121); to Defendant's counter-statement to Plaintiff's Rule 56.1 Statement as "Def. Counter-56.1" (Dkt. #114); and to Plaintiff's counter-statement to Defendant's Rule 56.1 Statement as "Pl. Counter-56.1" (Dkt. #115).

2015.  (Def. 56.1 ¶ 6).  That year, Johann Wedell-Wedellsborg ("JWW"), a childhood friend of Defendant's and a board member of Y-mAbs, established WG Biotech, an investment vehicle, for the purpose of investing in Y-mAbs.  (Pl. 56.1 ¶ 4; Def. Counter-56.1 ¶ 4; Def. 56.1 ¶ 7).  JWW served as the majority owner and manager of WG Biotech.  (Def. 56.1 ¶ 11).  Since its formation in 2015, WG Biotech's only assets have consisted of shares of Y-mAbs common stock.  (Def. 56.1 ¶ 9; Pl. 56.1 ¶ 5).  Another JWW entity, Weco A/S ("Weco"), served as the holding company for (and thus as a shareholder of) WG Biotech. (Def. 56.1 ¶¶ 12, 59).[2]

Later that same year, Defendant invested in WG Biotech through GAD Enterprises, an entity that was solely owned and controlled by Defendant and his wife.  (Def. 56.1 ¶¶ 5-6).  Thereafter, GAD Enterprises owned Y-mAbs common stock both directly as well as indirectly through its ownership of WG Biotech.  (*Id.* ¶ 15).  Defendant thus held Y-mAbs common stock indirectly through both GAD Enterprises and WG Biotech.  (*Id.*).[3]

GAD Enterprises' investment in WG Biotech was memorialized in August 2015 through the WG Biotech Owner Agreement (the "Shareholders'

---

[2]    "Weco A/S" appears to be used interchangeably with "Weco Group A/S," "Weco," and "Weco Group" in the parties' submissions, including Rule 56.1 statements, depositions, and other underlying documents.  (*See, e.g.*, Asaro Decl., Ex. 3 (JWW Deposition Transcript) at 46:24-47:9, 52:15-53:3; Asaro Decl., Ex. 4 (Myhrmann Deposition Transcript) at 5:20-7:15; Gad Decl., Ex. 4 (Gad's Objections and Responses to Plaintiff's Requests for Admissions) at 6-7; Def. 56.1 ¶ 56; Pl. Counter-56.1 ¶ 56).  The Court will refer to this entity as "Weco" throughout this Opinion.

[3]    Plaintiff objects to describing GAD Enterprises as owning Y-mAbs stock "indirectly through ownership of WG Biotech."  (Pl. Counter-56.1 ¶ 15; *see also* Pl. Br. 19 (arguing that an example of "indirect" ownership would be "a transfer of shares from Gad [] to Gad [Enterprises]")).

Agreement"). (Def. 56.1 ¶ 10; *see generally* Gad Decl., Ex. 1 ("SA")). The Shareholders' Agreement was executed by Defendant and two of his entities — non-parties GAD Enterprises and GAD Management, LLC — on the one side, and JWW and his affiliate Weco Biotech ApS ("Weco Biotech") on the other. (Def. 56.1 ¶ 10; *see generally* SA). The purpose of the Shareholders' Agreement was "to ensure and regulate the parties['] collaboration" regarding WG Biotech's investment in Y-mAbs. (SA ¶ 1.1). At the time of the execution of the Shareholders' Agreement, the ownership of WG Biotech was split between GAD Enterprises, Defendant's entity, with a 36.1% ownership interest, and Weco Biotech, JWW's entity, with a 63.9% ownership interest. (Def. 56.1 ¶ 13; Pl. Counter-56.1 ¶ 13).

A number of provisions of the Shareholders' Agreement are relevant to the instant dispute. Specifically, under the Shareholders' Agreement:

- While GAD Enterprises (and thus Defendant) had certain rights, WG Biotech was ultimately controlled by JWW, who in turn controlled "the disposition and voting of the Y-mAbs shares held by WG Biotech for the benefit of GAD Enterprises." (Def. 56.1 ¶ 36; Pl. Counter-56.1 ¶ 36). At no time did Gad control WG Biotech, either directly or through his companies, GAD Enterprises or GAD Management, LLC. (*Id.* ¶ 37).

- GAD Enterprises' holdings of WG Biotech could not be sold or pledged elsewhere without GAD Enterprises' consent. (Def. 56.1 ¶ 33; SA ¶¶ 8-10 (stating that each party was entitled "to transfer its shares in entirety or in parts," and that the other party had the right of first refusal)).

- GAD Enterprises agreed to pledge certain shares of WG Biotech to Weco Biotech, JWW's entity, in exchange for a loan (the "WB Loan"). (Def. 56.1 ¶ 38). GAD

5

Enterprises was allowed to release this pledge by repaying the WB Loan to Weco Biotech.  (*Id.* ¶ 39).

- GAD Enterprises could demand that WG Biotech distribute a total of 33.3% of the prior year's profits — which would have come from dividends by Y-mAbs — to GAD Enterprises.  (Def. 56.1 ¶ 25; Pl. Counter-56.1 ¶ 25; SA ¶ 16.1 ("Any party may demand that [WG Biotech], within the relevant legal provisions, distribute a total of 33.3% of previous year's profits as dividends.")).  Though GAD Enterprises was entitled to this portion of WG Biotech's profits, WG Biotech's shares of Y-mAbs did not earn dividends, which would have been paid to GAD Enterprises.  (Def. 56.1 ¶ 26; Pl. Counter-56.1 ¶ 26).

### 3.    Investments in Y-mAbs

Beginning in 2016, "other investors" began investing in WG Biotech. (Def. 56.1 ¶ 40).[4]  Importantly, the shares of Y-mAbs common stock held by WG Biotech were specifically attributed to WG Biotech's investors (including GAD Enterprises) based on each investor's *pro rata* ownership of WG Biotech. (*Id.* ¶ 41; Pl. Counter-56.1 ¶ 41).  To that end, WG Biotech's records identify each WG Biotech investor, the number of WG Biotech shares owned by that investor, and the number of Y-mAbs shares owned by that investor based on its *pro rata* ownership in WG Biotech.  (Def. 56.1 ¶ 42).

In September 2018, Y-mAbs became a publicly listed and traded company on the Nasdaq Global Select Market.  (Def. 56.1 ¶ 43).  After Y-mAbs went public, Defendant regularly filed reports with the U.S. Securities and Exchange Commission (the "SEC") disclosing his beneficial ownership of Y-

---

[4]    Plaintiff clarifies that these "other investors" invested in WG Biotech by purchasing WG Biotech shares from GAD Enterprises.  (Pl. Counter-56.1 ¶ 40).

mAbs common stock through both GAD Enterprises and WG Biotech. (*Id.* ¶ 44; *see, e.g.*, Gad Decl., Ex. 2 at 2 (SEC Form 3, Initial Statement of Beneficial Ownership of Securities, dated September 20, 2018); Gad Decl., Ex. 3C at 2 (SEC Form 4, Statement of Changes in Beneficial Ownership, dated March 12, 2021)).

For example, on April 11, 2019, Defendant filed a Form 4 – Statement of Changes in Beneficial Ownership ("Form 4") with the SEC, which form reported that GAD Enterprises indirectly beneficially owned 1,030,557 shares of Y-mAbs common stock through his then-20.57% ownership of WG Biotech, which in turn owned 5,010,000 shares of Y-mAbs common stock. (Def. 56.1 ¶¶ 48-49; Pl. Counter-56.1 ¶ 49; *see* Gad Decl., Ex. 3A at 3). The Form 4 also reflected GAD Enterprises' direct ownership of 940,000 shares of Y-mAbs common stock. (*See id.*). Later, on December 31, 2019, Defendant filed another Form 4, which reported that GAD Enterprises indirectly beneficially owned 1,030,356 shares of Y-mAbs common stock through his then-18.71% ownership of WG Biotech, which in turn owned 5,508,392 shares of Y-mAbs common stock. (Def. 56.1 ¶¶ 50-51; Pl. Counter-56.1 ¶ 51; *see* Gad Decl., Ex. 3A at 22). The Form 4 also reflected GAD Enterprises' direct ownership of 860,000 shares of Y-mAbs common stock. (*See id.*). Further, the Form 4 indicated that WG Biotech's holdings of Y-mAbs common stock had increased due to a transfer of 498,392 shares of Y-mAbs common stock from WG Biotech's holding company Weco, in exchange for 9,948 ordinary shares of WG Biotech. (Def. 56.1 ¶ 52; *see* Gad Decl., Ex. 3A at 22 n.2).

### 4.    The July 2019 Transaction

In 2019, JWW decided to eliminate all minority investors in WG Biotech, except for his affiliated companies (Def. 56.1 ¶ 58; Pl. Counter-56.1 ¶ 58), with the assistance of Oluf Myhrmann, Weco's group treasurer (Def. 56.1 ¶ 12). Importantly, at that time, Weco was both an investor in WG Biotech and a direct owner of Y-mAbs shares.  (*Id.* ¶ 59).  To effectuate their plan, the two men caused Weco to enter into an agreement with all of WG Biotech's minority investors *other than Weco Biotech and GAD Enterprises*, whereby Weco traded its directly-held Y-mAbs shares for the minority investors' holdings in WG Biotech (the "July 2019 Transaction").  (*Id.* ¶¶ 58-59).[5]  Each of the minority investors' WG Biotech shares was exchanged for approximately 50.1 Y-mAbs shares.  (*Id.* ¶ 60; Pl. Counter-56.1 ¶ 60).  As a result of the July 2019 Transaction, WG Biotech's former minority investors directly owned Y-mAbs shares and no longer held shares of WG Biotech.  (Def. 56.1 ¶ 61; Pl. Counter-56.1 ¶ 60).  Of note, Defendant had neither involvement in nor authority over the terms or timing of this transaction.  (*See* Asaro Decl., Ex. 4 (Myhrmann Deposition Transcript) at 31:19-38:25).

After the July 2019 Transaction, WG Biotech's remaining shareholders were GAD Enterprises, Weco, and Weco Biotech.  (Def. 56.1 ¶ 64; Pl. Counter-

---

[5]    Plaintiff asserts that Mhyrmann testified that in 2019, JWW endeavored to eliminate all minority investors in WG Biotech except for his affiliated companies *and* GAD Enterprises.  (Pl. Counter-56.1 ¶¶ 58, 63).  Mhyrmann's deposition transcript belies this assertion and states that JWW intended to eliminate all minority investors, including GAD Enterprises, but that the exchanges occurred in sequence rather than all at one time.  (Asaro Decl., Ex. 4 at 31:19-38:25).

56.1 ¶ 64).  In other words, WG Biotech's shares were under the control of GAD

Enterprises or JWW's wholly owned and controlled subsidiaries.  (*Id.*).

### 5.    The March 2021 Transaction and the Exchange Agreement

On March 2, 2021, Gad filed an updated Form 4 in which GAD

Enterprises reported owning 1,030,356 Y-mAbs shares indirectly through WG

Biotech as well as 596,000 Y-mAbs shares directly.  (Def. 56.1 ¶¶ 67, 77; Pl.

Counter-56.1 ¶ 67; Gad Decl., Ex. 3B at 34).  WG Biotech held 5,508,392

shares of Y-mAbs common stock at this time.  (Def. 56.1 ¶ 68).

The next day, March 3, 2021, GAD Enterprises and WG Biotech entered

into an agreement (the "Exchange Agreement") that would have the effect of

eliminating GAD Enterprises' ownership interest in WG Biotech.  (Def. 56.1

¶ 71).  Pursuant to the Exchange Agreement, GAD Enterprises was to exchange

20,565 shares of WG Biotech for 1,029,927 shares of Y-mAbs.  (*Id.* ¶ 73).  GAD

Enterprises was to receive 1,029,927 shares of Y-mAbs common stock —

rather than the 1,030,356 shares of Y-mAbs common stock that Defendant had

reported indirectly owning through WG Biotech on his March 2, 2021

Form 4 — because GAD Enterprises still owed money to Weco Biotech on the

WB Loan, which GAD Enterprises had taken out pursuant to the Shareholders'

Agreement.  (*Id.* ¶ 77).

The Exchange Agreement was effectuated on March 10, 2021 (the "March

2021 Transaction").  (Def. 56.1 ¶ 80).  On March 10, 2021, the closing sale

price of Y-mAbs common stock was $35.30 per share.  (Pl. 56.1 ¶ 24; Def.

Counter-56.1 ¶ 24).  Once the transaction was complete, GAD Enterprises no

longer held shares of WG Biotech, thereby extinguishing GAD Enterprises'
"right, title, and interest in WG Biotech." (Def. 56.1 ¶ 78). Further, WG
Biotech's only investors were entities under JWW's control. (*Id.* ¶¶ 65-66).

The July 2019 Transaction and the March 2021 Transaction were
executed "on the same material terms" as one another. (Def. 56.1 ¶ 75).[6] Each
of GAD Enterprises' shares of WG Biotech was exchanged for approximately
50.1 shares of Y-mAbs common stock, the same consideration received by the
minority investors who were parties to the July 2019 Transaction. (*Id.* ¶¶ 74,
81). On March 12, 2021, Defendant filed a Form 4 disclosing that 1,029,927
shares of Y-mAbs common stock had been transferred to GAD Enterprises by
WG Biotech in exchange for 20,565 shares of WG Biotech. (*Id.* ¶ 82; *see* Gad
Decl., Ex. 3C at 3 n.1).

### 6. Defendant's Sales of Y-mAbs Common Stock Before and After the March 2021 Transaction

Relevant to the instant dispute, in the six months before the March 2021
Transaction, *i.e.*, between October 15, 2020, and March 2, 2021, Defendant
engaged in 19 transactions in which he sold Y-mAbs stock directly owned by
GAD Enterprises. (Pl. 56.1 ¶¶ 28-29; *see also* Tauber Aff., Ex. 16-19).
Importantly, these sales were made at prices greater than $35.30 per share.
(Pl. 56.1 ¶¶ 28-29).

---

[6]    Plaintiff does not appear to dispute that the terms of the two transactions were
effectively the same, but maintains that Defendant voluntarily agreed to the Exchange
Agreement and had the capacity to negotiate its terms. (Pl. Counter-56.1 ¶¶ 72, 74-75).

Following the March 2021 Transaction, GAD Enterprises had the sole right to sell the shares of Y-mAbs common stock that it had obtained from that exchange, having been released from the strictures of the Shareholders' Agreement.  (Def. 56.1 ¶ 84; SA ¶ 18.1 (stipulating that the Shareholders' Agreement was "irrevocable" until the parties agreed to terminate it or "until a party becomes the owner of all [of] the shares [of WG Biotech]")).  In the six months thereafter, Defendant engaged in four transactions in which he sold Y-mAbs stock at prices greater than $35.30 per share.  (Pl. 56.1 ¶¶ 28-29).

Defendant's sales of Y-mAbs stock in the six months before and after the March 2021 Transaction are as follows:

| Sale Date | Shares | Price/Share | Sale Proceeds |
|---|---|---|---|
| 10/15/2020 | 4,000 | $39.15 | $156,604 |
| 11/02/2020 | 4,000 | $43.69 | $174,769 |
| 11/16/2020 | 4,000 | $46.17 | $184,672 |
| 12/01/2020 | 4,000 | $51.42 | $205,685 |
| 12/10/2020 | 50,000 | $50.75 | $2,537,620 |
| 12/11/2020 | 50,000 | $51.17 | $2,558,640 |
| 12/14/2020 | 4,000 | $52.89 | $211,546 |
| 12/16/2020 | 7,000 | $53.01 | $371,065 |
| 12/28/2020 | 7,000 | $51.98 | $363,833 |
| 01/05/2021 | 7,000 | $49.36 | $345,509 |
| 01/05/2021 | 4,000 | $49.31 | $197,248 |
| 01/19/2021 | 7,000 | $46.51 | $325,563 |
| 01/19/2021 | 4,000 | $46.56 | $186,230 |
| 02/01/2021 | 7,000 | $41.99 | $293,897 |
| 02/01/2021 | 4,000 | $41.97 | $167,888 |
| 02/16/2021 | 7,000 | $47.08 | $329,556 |
| 02/16/2021 | 4,000 | $47.09 | $188,367 |
| 03/01/2021 | 9,000 | $35.51 | $319,611 |
| 03/01/2021 | 6,000 | $35.50 | $213,029 |
| 03/15/2021 | 7,000 | $36.79 | $257,554 |
| 03/15/2021 | 4,000 | $36.78 | $147,120 |
| 05/28/2021 | 4,000 | $36.95 | $147,813 |
| 06/14/2021 | 4,000 | $35.80 | $143,217 |

| Total Shares Sold | 212,000 | Total Sale Proceeds | $10,027,034 |
|---|---|---|---|

(Pl. 56.1 ¶ 28; Def. Counter-56.1 ¶ 28 (not disputing the accuracy of the transaction data)).  Plaintiff seeks to recover the purported short-swing profits realized by Defendant through the above transactions.  (Compl. ¶ 21).

## B.    Procedural Background

Original Plaintiff Deborah Donoghue initiated this case by filing a complaint (the "Complaint") on August 25, 2021.  (Dkt. #1).  On November 29, 2021, Nominal Defendant Y-mAbs filed its answer to the Complaint.  (Dkt. #28).  Following a pre-motion conference on December 1, 2021 (*see* Minute Entry for December 1, 2021), Defendant filed a motion to dismiss on December 17, 2021 (Dkt. #29).  Original Plaintiff filed her opposition brief on December 31, 2021.  (Dkt. #33).  Defendant filed a reply brief in further support of his motion to dismiss on January 12, 2022.  (Dkt. #35).

On August 8, 2022, this Court denied Defendant's motion to dismiss. (Dkt. #37).  Of potential significance to the instant motion, the Court determined that the record in place at the time did not allow the Court to conclude as a matter of law that Defendant's acquisition of Y-mAbs common stock on March 10, 2021, was exempt from Section 16(b) under Rule 16a-13. (*Id.* at 6).  On August 25, 2022, the Court issued a case management plan and scheduling order, permitting the parties to proceed to discovery.  (Dkt. #41).

On September 9, 2022, Defendant Gad filed an answer to the Complaint. (Dkt. #42 ("Gad Answer")).  Shortly thereafter, on September 21, 2022, counsel for Original Plaintiff informed the Court that Original Plaintiff had passed away.

12

(Dkt. #43). Following the notice of Original Plaintiff's death, the parties requested an extension of time on all deadlines set forth in the August 25, 2022 scheduling order. (Dkt. #45). The Court granted that request on September 26, 2022 (Dkt. #46) and issued an amended scheduling order the following day (Dkt. #47).

On October 6, 2022, counsel for Plaintiff filed a letter motion to add another shareholder of Y-mAbs — not Dennis Donoghue — to the lawsuit as an additional plaintiff-intervenor. (Dkt. #50). Defendant opposed this motion. (Dkt. #51). The Court denied the letter motion without prejudice as to its renewal as a formal motion. (Dkt. #52).

Subsequently, Plaintiff's counsel moved to substitute now-Plaintiff Dennis Donoghue as party to this litigation and to terminate Original Plaintiff on November 7, 2022. (Dkt. #53-55). Neither Nominal Defendant nor Defendant objected to the substitution motion. (Dkt. #56). The Court granted the motion to substitute parties on November 17, 2022. (Dkt. #57).

Following the substitution of parties, on December 30, 2022, Plaintiff requested permission to seek letters rogatory to obtain the assistance of law enforcement in Denmark in procuring discovery from JWW in the form of documents and oral deposition testimony. (Dkt. #58). Later that same day, Defendant sought additional time to complete discovery (Dkt. #59), given the delays incurred by the applications for intervention (Dkt. #50-52); the substitution of parties (Dkt. #53-57); and the challenges in obtaining JWW's deposition testimony (Dkt. #58). The Court granted Plaintiff's request for leave

13

to move for letters rogatory as well as Defendant's request for an additional sixty days to complete discovery.  (Dkt. #60; Dkt. #61 (Second Amended Case Management Plan and Scheduling Order)).

On January 9, 2023, Plaintiff moved for letters rogatory to compel JWW's appearance for a deposition.  (Dkt. #63).  Neither Defendant nor Nominal Defendant objected to Plaintiff's motion.  (Dkt. #64-65).  The Court thus granted Plaintiff's motion for letters rogatory on January 17, 2023.  (Dkt. #66).

On April 27, 2023, the parties jointly filed a pre-conference letter to update the Court on the progress of discovery and to request a mediation conference with a Magistrate Judge prior to any motions for summary judgment.  (Dkt. #68).  The Court accordingly referred the case to Magistrate Judge Sarah L. Cave for a settlement conference on May 3, 2023.  (Dkt. #70).  However, the parties were unable to resolve the matter through settlement (*see* Dkt. #77), and on May 30, 2023, the Court set forth a briefing schedule on the parties' anticipated cross-motions for summary judgment (*see* Dkt. #77-79).

Following a change of counsel for Defendant (*see* Dkt. #90, 92, 95, 96, 97), and subsequent amendments to the original briefing schedule (*see* Dkt. #88, 95, 101), the parties ultimately filed their cross-motions for summary judgment in early 2024.  Specifically, Defendant filed his motion for summary judgment and supporting documents on January 31, 2024.  (Dkt. #102-106).  Plaintiff filed his motion for summary judgment and supporting documents on

February 1, 2024.  (Dkt. #107-110).[7]  Pursuant to this District's local rules, each party submitted a statement of material facts in conjunction with their motion for summary judgment.  *See* S.D.N.Y. Local Rule 56.1(a) (noting that each party moving for summary judgment under Fed. R. Civ. P. 56 must submit "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried").  (*See also* Dkt. #104 (Defendant's Rule 56.1 Statement, filed January 31, 2024); Dkt. #109 (Plaintiff's Rule 56.1 Statement, filed February 1, 2024)).  Defendant filed his memorandum of law in opposition to Plaintiff's motion for summary judgment as well as his counterstatement to Plaintiff's Rule 56.1 Statement on February 29, 2024.  (Dkt. #113-114).  Plaintiff filed his memorandum of law in opposition to Defendant's motion for summary judgment and his counterstatement to Defendant's Rule 56.1 Statement on March 1, 2024.  (Dkt. #115-116).  Plaintiff and Defendant each filed reply briefs in further support of their respective motions for summary judgment on March 19, 2024.  (Dkt. #121-122).

---

[7]    Though Plaintiff submitted his motion for summary judgment and related materials after the January 31, 2024 deadline, the Court granted Plaintiff's application to file these materials a few hours after the deadline due to technical challenges.  (Dkt. #111-112).

## DISCUSSION

### A.    Applicable Law

#### 1.    Motions for Summary Judgment Under Rule 56

To succeed on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a), a litigant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8]  Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  Further, in considering whether the movant has met its burden to "show that no genuine factual dispute exists," a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor."  *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

The standard used to decide cross-motions for summary judgment, such as the motions pending before the Court, "is the same as that for individual summary judgment motions[;] a court must consider each motion independent

---

[8]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

of the other." *Worldwide Home Prods., Inc.* v. *Bed, Bath and Beyond, Inc.*, 74 F.

Supp. 3d 626, 634 (S.D.N.Y. 2015) (internal quotation marks omitted); *see*

*Auscape Intern.* v. *Nat'l Geographic Soc.*, 409 F. Supp. 2d 235, 238 (S.D.N.Y.

2004) ("A court faced with cross-motions for summary judgment need not

'grant judgment as a matter of law for one side or the other,' but 'must evaluate

each party's motion on its own merits, taking care in each instance to draw all

reasonable inferences against the party whose motion is under consideration.'"

(quoting *Heublein, Inc.* v. *United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)));

*accord Upstate Jobs Party* v. *Kosinski*, 106 F.4th 232, 244-45 (2d Cir. 2024).

## 2.    Section 16(b) of the Exchange Act

Section 16(b) of the Exchange Act "requires [certain corporate insiders] …

to disgorge all profits realized from any purchase and sale (or sale and

purchase) of the same security made within a six[-]month period," transactions

often referred to as "short-swing" trades. *Analytical Survs., Inc.* v. *Tonga*

*Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012). Specifically, the statute reads:

> For the purpose of preventing the unfair use of
> information which may have been obtained by [an
> insider] … any profit realized by him from any purchase
> and sale, or any sale and purchase, of any equity
> security of such issuer … within any period of less than
> six months … shall inure to and be recoverable by the
> issuer, irrespective of any intention on the part of such
> [insider][.]

15 U.S.C. § 78p(b). The purpose of Section 16(b) is "to prevent the unfair use

of information which may have been obtained by [a] beneficial owner, director,

or officer by reason of his relationship to the issuer." *Packer on Behalf of 1-*

*800-Flowers.Com, Inc.* v. *Raging Cap. Mgmt., LLC*, 105 F.4th 46, 52-53 (2d Cir. 2024) (internal quotation marks omitted).

For liability to attach to a short-swing trade under Section 16(b), a plaintiff must prove that "there was [i] a purchase and [ii] a sale of securities [iii] by an [insider] [iv] within a six-month period." *Chechele* v. *Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (quoting *Gwozdzinsky* v. *Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)).[9]  Importantly, the statute applies irrespective of the insider's motivation for making the trades.  *See Analytical Survs.*, 684 F.3d at 43; *Rubenstein* v. *Int'l Value Advisers, LLC*, 959 F.3d 541, 543 (2d Cir. 2020) ("[Section 16(b)] imposes strict liability on certain insiders of an issuer, requiring them to disgorge to the issuer any profits they realize from short-swing trading in the issuer's securities.").  Further, the statute extends "not only to routine cash purchases and sales, but also acquisitions and dispositions of equity securities in transactions such as conversions, options, stock warrants, and reclassifications." *Huppe* v. *WPCS Int'l Inc.*, 670 F.3d 214, 218 (2d Cir. 2012) (citing *Blau* v. *Lamb*, 363 F.2d 507, 516 (2d Cir. 1966)).

In contrast to most federal securities laws, Section 16(b) "does not confer enforcement authority on the [SEC]." *Donoghue* v. *Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 174 (2d Cir. 2012) (quoting *Gollust* v. *Mendell*, 501 U.S. 115, 122 (1991)).  Rather, "[t]he statute allows the company whose stock was traded to recover profits made by the beneficial owner during that period." *Avalon*

---

[9]     Because many Section 16(b) lawsuits are brought by a small number of plaintiffs, including Original Plaintiff here, the Court uses the name of the defendant in the short form citation of certain cases to avoid confusion.

*Holdings Corp.* v. *Gentile*, No. 18 Civ. 7291 (DLC) (RWL), 2023 WL 6566810, at

*1 (S.D.N.Y. Oct. 6, 2023). Specifically, Section 16(b) authorizes two categories

of private persons to sue for relief:

> [i] "the issuer" of the security traded in violation of § 16(b); *or* [ii] "the owner of any security of the issuer in the name and on behalf of the issuer," but only "if the issuer shall refuse to bring such suit within sixty days after the request or shall fail diligently to prosecute the same thereafter."

*Bulldog Invs.*, 696 F.3d at 174 (quoting 15 U.S.C. § 78p(b)) (emphasis in

original).

## B.    Analysis

Both parties seek summary judgment on Plaintiff's claim for

disgorgement of Defendant's alleged short-swing profits, reasoning either that

the March 2021 Transaction is subject to Section 16(b) liability, as Plaintiff

contends (*see, e.g.*, Pl. Br. 1), or that it is not, as Defendant contends (*see, e.g.*,

Def. Br. 1). As detailed above, for liability to attach under Section 16(b),

Plaintiff must prove that "there was [i] a purchase and [ii] a sale of securities

[iii] by an [insider] [iv] within a six-month period." *Sperling*, 758 F.3d at 467.

Here, the parties' cross-motions turn on the adjudication of two disputes:

(i) whether the March 2021 Transaction constituted a "purchase" of Y-mAbs

shares under Section 16(b) (*see, e.g.*, Pl. Br. 8-9; Def. Br. 14-15), and

(ii) whether SEC Rule 16a-13, which exempts from Section 16(b) liability any

acquisition that effects "only a change in the form of beneficial ownership

without changing a person's pecuniary interest in the subject equity

securities," 17 C.F.R. § 240.16a-13, applies to the March 2021 Transaction (*see, e.g.*, Pl. Br. 18-19; Def. Br. 20).

For the reasons that follow, the Court finds *both* that the March 2021 Transaction was not a "purchase" under Section 16(b) and that the Rule 16a-13 exemption applies to the March 2021 Transaction, each an independent basis for concluding that Section 16(b) liability does not attach to Defendant's trades. Accordingly, the Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for the same.

### 1. The March 2021 Transaction Was Not a Purchase Under Section 16(b)

To begin, the parties disagree as to whether Defendant's acquisition of the 1,029,927 shares of Y-mAbs common stock from WG Biotech in exchange for his 20,565 shares of WG Biotech (*i.e.*, the March 2021 Transaction) constitutes a "purchase" of Y-mAbs shares under Section 16(b). (*See, e.g.*, Pl. Br. 8-9; Def. Br. 14-15). As set forth herein, the Court finds that the March 2021 Transaction did not constitute a "purchase" for Section 16(b) purposes, and therefore that Section 16(b) liability does not attach to Defendant as a consequence of that transaction.

The Exchange Act defines a "purchase" (for the purposes of Section 16(b) and otherwise) to "include any contract to buy, purchase, or otherwise acquire." *DiLorenzo* v. *Murphy*, 443 F.3d 224, 227 (2d Cir. 2006) (emphasis omitted) (quoting 15 U.S.C. § 78c(a)(13)). This definition is a "broad[]" one, and "may be applied not only to routine cash purchases and sales, but also to acquisitions and dispositions of equity securities in transactions such as

20

conversions, options, stock warrants, and reclassifications." *Huppe*, 670 F.3d at 218.

In some cases, it is clear that a transaction at issue is a "purchase" pursuant to Section 16(b).  That is, certain types of transactions "plainly fall within the literal terms of [Section 16(b)]." *Steel Partners II, L.P.* v. *Bell Industries, Inc.*, 315 F.3d 120, 124 (2d Cir. 2002) ("*Steel Partners*").  In those cases, the defendants typically acquire or dispose of certain securities in exchange for fiat currency.  *See, e.g.*, *Bulldog Invs.*, 696 F.3d at 173 (finding that purchase and sale of shares on open market indisputably constituted a "purchase" under Section 16(b)); *Huppe*, 670 F.3d at 216-18 (finding that acquisition of securities from an issuer — wherein "[defendants] … bought 876,931 additional shares directly from [the nominal defendant-issuer] at $7.00 per share" — plainly constituted a "purchase" under Section 16(b)).

Unfortunately, this case is not one of them.  That is, the March 2021 Transaction does not "plainly fall within the literal terms of the statute." *Steel Partners*, 315 F.3d at 124.  Rather, the March 2021 Transaction — pursuant to which two parties exchanged one type of securities for another without regard to the dollar value of either, with the purpose and design of extinguishing each party's interest in the other party's entity — presents a "novel theory of insider purchasing." *At Home Corp.* v. *Cox Communications, Inc.*, 446 F.3d 403, 408 (2d Cir. 2006) ("*At Home*").  Indeed, it constitutes a case of first impression in this District.

The Second Circuit has cautioned that, where a transaction does not "plainly fall within the literal terms of the statute," *Steel Partners*, 315 F.3d at 124, "[t]he judicial tendency, especially in this [C]ircuit, has been to interpret Section 16(b) in ways that are most consistent with [its] legislative purpose," *DiLorenzo*, 443 F.3d at 227 (quoting *Steel Partners*, 315 F.3d at 124 (internal quotation marks omitted)).  Generally, this analysis proceeds in one of two ways.  *First*, for certain "borderline" or "unorthodox" transactions, *Huppe*, 670 F.3d at 218, the Supreme Court has instructed courts to

> inquire whether the transaction [at issue] may serve as a vehicle for the evil which Congress sought to prevent [in enacting Section 16(b)] — the realization of short-swing profits based upon access to inside information — thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits.

*Kern County Land Co.* v. *Occidental Petroleum Corp.*, 411 U.S. 582, 594-95 (1973).  Courts have come to refer to this doctrine as the "unorthodox" or "borderline" transaction exception, or eponymously as the *Kern County* approach.  *See, e.g.*, *Canoo Inc.* v. *DD Global Holdings Ltd.*, No. 22 Civ. 3747 (MKV), 2023 WL 6162296, at *8 (S.D.N.Y. Sept. 21, 2023) (citing *Huppe*, 670 F.3d at 218).

The borderline transaction exception only applies when two factual criteria are met: (i) the transaction was made involuntarily by an insider and (ii) that insider had no access to inside information.  *See, e.g.*, *Analytical Survs.*, 684 F.3d at 46 (noting that "both an involuntary transaction and lack of access to inside information are prerequisites to the *Kern County* analysis"

(citing *Huppe*, 670 F.3d at 219)); *Donoghue* v. *Tannenbaum*, No. 22-1156, 2023 WL 4631963, at *2 (2d Cir. July 20, 2023) (summary order) ("We apply this unorthodox transaction exception only if [i] the transaction is an involuntary transaction by an insider, and [ii] that insider had no access to inside information." (alterations adopted) (internal quotation marks omitted)).  If both factual criteria are met, courts then proceed to analyze whether such transactions present "the potential for speculative abuse of [] inside information."  *Kern County*, 411 U.S. at 599.

*Second*, in cases where the disputed transaction does not "plainly fall within the literal terms of the statute," *Steel Partners*, 315 F.3d at 124, but where *Kern County* does not apply, *see, e.g.*, *Analytical Survs.*, 684 F.3d at 46 (noting that "the *Kern County* borderline transaction approach does not control cases involving 'a garden-variety insider' who had [] access" to exploitable inside information), courts simply analyze whether the transaction at issue presents a risk of the type of speculative abuse Section 16(b) seeks to prevent, *see, e.g.*, *At Home*, 446 F.3d at 408-09.  As the Second Circuit has noted, "the growing complexities of financial transactions have generated numerous issues of statutory interpretation that admit of no clear resolution."  *Roth* v. *Goldman Sachs Grp., Inc.*, 740 F.3d 865, 869 (2d Cir. 2014).  Accordingly, in cases of first impression — *i.e.*, where courts are presented with novel securities transactions vis-à-vis Section 16(b) liability — this Circuit has applied the statutory purpose analysis without requiring the two factual prerequisites from *Kern County* to be met.

For instance, in *At Home Corp.* v. *Cox Communications, Inc.*, the Second Circuit considered whether "an insider's acquisition of stock in the issuer by acquisition of a third-party intermediary company gives rise to [S]ection 16(b) liability for short-swing profits." 446 F.3d at 409. Importantly, the Court found that the *Kern County* criteria were not met by the transactions at issue because they involved a "garden-variety insider." *Id.* at 408. Nevertheless, the Court concluded that the transactions were not "purchases" under Section 16(b) because they were "[g]ood faith change in control transactions" that did not present the risk of insider speculation. *Id.* at 409 (internal quotation marks omitted). Specifically, the Court found persuasive the SEC's recommendation (via *amicus* brief) that "a typical change-of control transaction does not present an intolerable risk of abuse[.]" *Id.*[10]

*At Home* stands for the proposition that, even where *Kern Country* does not apply, a novel transaction may still escape Section 16(b) liability if it involves no risk of insider speculation. *See At Home*, 446 F.3d at 409; *see also Sperling*, 758 F.3d at 470 (analyzing "risk of manipulation" presented by defendants' transactions where it was undisputed that defendants were "insiders")*; Gibbons* v. *Malone*, 703 F.3d 595, 601 (2d Cir. 2013) ("[W]e generally interpret ambiguous terms of [Section] 16(b) in a way that best serves the congressional purpose of curbing short-swing speculation by corporate

---

[10]     The Second Circuit stated that while it found the SEC's *amicus* brief in *At Home* persuasive, it did not need to decide whether the SEC's submission would "command deference." *At Home Corp.* v. *Cox Communications, Inc.*, 446 F.3d 403, 409 n.5 (2d Cir. 2006).

insiders." (internal quotation marks omitted)); *cf. Gwozdzinsky*, 156 F.3d at 310 (explaining that courts look to "the substance of ... transactions" to assess the possibility of speculative abuse of insider information "and, where the possibility of speculative abuse [is] not shown," "refuse to impose liability even though there was arguably a matching purchase and sale by an insider within six months").

When determining whether a transaction presents a risk of insider speculation, courts in this Circuit have focused on whether defendants were able to manipulate the criteria or terms that governed the transaction at issue based on their access to inside information.  *See, e.g., Allaire Corp.* v. *Okumus*, 433 F.3d 248, 252 (2d Cir. 2006) ("[S]ection 16(b) covers only the transaction in which the parties agree to the terms of sale, because that is the one in which the writer of the option can be deemed to be using his or her inside information to arrive at the option's terms on a favorable basis."); *Donoghue* v. *Murdock*, No. 13 Civ. 1224 (PAE), 2013 WL 4007565, at *8 (S.D.N.Y. Aug. 6, 2013) ("If a financial instrument lacks a fixed settlement price, but will settle on a determinate date at a price to be calculated by a predetermined formula ... the die is cast ... [t]he insider's only opportunity to abuse inside information occurs at acquisition, not at settlement."); *Chechele* v. *Sperling*, No. 11 Civ. 146 (PAC), 2012 WL 1038653, at *5 (S.D.N.Y. Mar. 29, 2012) (finding that treating the date of acquisition as the relevant sale date, rather than the date of settlement, furthered Section 16(b)'s purpose because "the number of shares to be sold on the settlement date depended upon formulas which were set two to three years

25

earlier" and "[defendants] had no opportunity to speculate on the basis of their inside information at the time of [settlement]").  Put another way, if, at the time of a transaction, a defendant lacks the ability to manipulate the previously established terms of that transaction to benefit from her possession of inside information, the transaction does not constitute a purchase under Section 16(b).

The analysis of a sister court in this District in *Donoghue* v. *Murdock* is illuminative of this point.  2013 WL 4007565.[11]  In that case, the plaintiff, a security owner of Dole Food Company, Inc. ("Dole"), brought a complaint under Section 16(b) against defendant David Murdock ("Murdock") and, nominally, Dole.  *Id.* at *1.  The plaintiff alleged that Murdock, who was a fiduciary of Dole, realized short-swing profits when he purchased nearly five million shares of Dole within a six-month window of a Settlement Date of a Forward Purchase Agreement for Dole common stock.  *Id.*  Murdock and Dole moved to dismiss the plaintiff's amended complaint, and the court granted their motion.  *Id.*  In reaching that decision, the court considered dispositive the fact that Murdock was not able to influence the terms of the settlement transaction at any point close in time to the transaction.  *Id.* at *8.

---

[11]    The Court notes that in *Donoghue* v. *Murdock*, the disputed transaction was a "sale," as opposed to a "purchase."  2013 WL 4007565, at *4.  The Court does not believe that this fact renders *Murdock* inapposite — at least, its analysis of whether the transaction at issue presented a risk of insider speculation.  Indeed, the *Murdock* Court analogized the transaction at issue in that case to the transaction at issue in *Chechele* v. *Sperling*, No. 11 Civ. 146 (PAC), 2012 WL 1038653 (S.D.N.Y. Mar. 29, 2012), which transaction was undoubtedly a "purchase."

In other words, the key question for the *Murdock* court was whether Murdock had the "ability to manipulate the settlement of the instrument to his advantage." *Murdock*, 2013 WL 4007565, at *8. The court reasoned that "[i]f a financial instrument lacks a fixed settlement price, but will settle on a determinate date at a price to be calculated by a predetermined formula, the insider has no ability to manipulate the settlement of the instrument to his advantage." *Id.* In other words, "[a]lthough the exact number of shares to be delivered, and hence the per share price, was not yet fixed at the date the [Forward Purchase Agreement] was entered into, the formula was [fixed] .... Murdock was powerless to change these terms." *Id.* at *9. The court thus rejected the plaintiff's claim that Murdock was able to take advantage of insider information at the time of the settlement transaction, finding instead that Murdock lacked an "*informational* advantage, which, as the statutory text makes clear, was the only type of insider advantage Congress intended [Section] 16(b) to strip away." *Id.* at *10 (quoting *Bruh* v. *Bessemer Venture Partners III LP*, 464 F.3d 202, 214 (2d Cir. 2006) (emphasis in original)).

The district court's analysis in *Chechele* v. *Sperling* is similarly informative. 2012 WL 1038653. In that case, the plaintiff ("Chechele") brought a complaint against defendants John and Peter Sperling (together, the "Sperlings") and nominal defendant Apollo Group, Inc. ("Apollo"), seeking disgorgement of alleged short-swing profits realized by the Sperlings via five forward sale agreements for Apollo stock. *Id.* at *1. The Sperlings moved to dismiss Chechele's complaint, and the court granted their motion. *Id.* As in

*Murdock*, the court attributed significant weight to the extent to which the Sperlings could have manipulated the terms of the transactions at the time of their execution.  *Id.* at *4.  Under the forward sale agreements, "the number of shares to be sold" in the transactions depended on formulas "set two to three years earlier, when the Sperlings entered into the agreements." *Id.* at *5.  The court accordingly reasoned that the Sperlings "had no opportunity to speculate on the basis of their inside information" at the time of the transactions because the terms had been set years prior, and thus the Sperlings could not be liable under Section 16(b).  *Id.*  In both *Murdock* and *Sperling*, the courts emphasized that the terms governing the settlement of the transactions at issue had been established sufficiently ahead of the execution of those transactions such that the risk of insider speculation was abated.

Turning to the facts of the instant case, the Court finds it appropriate to adopt the second approach to determining the applicability of Section 16(b). Similar to the cases discussed above, the Court finds that the *Kern County* approach does not apply here, in view of the fact that Defendant is clearly a "garden-variety" insider.  *At Home*, 446 F.3d at 408.  As Y-mAbs' founder, interim CEO, Head of Business Development, and President, Defendant plainly had access to non-public information that could be exploited for financial gain (Def. 56.1 ¶¶ 1-2); moreover, Defendant voluntarily exchanged Y-mAbs shares, reporting those sales to the SEC (Pl. 56.1 ¶ 28).  *Compare id.* (declaring *Kern Country* defendant an "atypical insider" because it "lacked access to inside information" and "its shares w[ere] sold involuntarily"), *with id.* at 407-08

(identifying defendant as a "garden-variety" insider because defendant acquired three cable companies that held warrants to purchase shares from plaintiff, "[effectively] placing those warrants in [defendant's] hands").

Accordingly, the question before the Court is whether the March 2021 Transaction presented a risk of insider speculation so as to fall within the scope of Section 16(b)'s strict liability. As discussed above, the answer to this question turns on whether Defendant, as an insider, could have manipulated the terms of the March 2021 Transaction, at the time of the settlement of the transaction, to be more favorable to him, on account of his access to inside information. Based on the record now before it, the Court finds that Defendant could not have done so, and thus is not liable under Section 16(b).

Several facts support the Court's conclusion that the terms of the March 2021 Transaction could not have been manipulated by Defendant at the time of the settlement of the transaction. *First*, the March 2021 Transaction provided for GAD Enterprises' repayment of the WB Loan from Weco Biotech (Def. 56.1 ¶ 77), which loan formed part of the initial Shareholders' Agreement between the parties. (*Id.* ¶ 39). The terms of the Shareholders' Agreement, which was executed in 2015, governed how the WB Loan could and ultimately would be repaid to Weco Biotech in March 2021. (*Id.* ¶ 77). That is, the fact that GAD Enterprises received 1,029,927 shares rather than 1,030,356 shares of Y-mAbs common stock in the March 2021 Transaction was a byproduct of the Shareholders' Agreement, not the Exchange Agreement. (*Id.*). Further, neither party has suggested that the terms of the WB Loan could be renegotiated by

29

either GAD Enterprises or Weco Biotech. Accordingly, as a baseline matter, Defendant had no ability to manipulate the terms pertaining to the WB Loan at the time of the March 2021 Transaction.

*Second*, the terms governing the July 2019 Transaction, which were materially identical to the terms governing the March 2021 Transaction, were decided upon by JWW and Myhrmann, absent any involvement or input from Defendant, two years prior to the March 2021 Transaction. (*See* Def. 56.1 ¶ 58; Asaro Decl., Ex. 4 (Myhrmann Deposition Transcript) at 31:19-38:25 (stating that Defendant had neither "control" over JWW and Myhrmann's decision to initiate the July 2019 Transaction or the March 2021 Transaction, nor any role in "structuring the transactions and exchanges")). Plaintiff emphasizes (and Defendant does not dispute) that Defendant willingly entered into the Exchange Agreement. (Pl. 56.1 ¶ 24; Def. Counter-56.1 ¶ 24). But Plaintiff also acknowledges that the July 2019 Transaction and the March 2021 Transaction were executed "on the same material terms" as each other (Def. 56.1 ¶ 75; *see also* Pl. Counter-56.1 ¶¶ 74-75), and that Defendant had no involvement in the decision to remove non-JWW controlled entities from WG Biotech's ownership (Def. 56.1 ¶ 58; Pl. Counter-56.1 ¶ 58.1). Plaintiff's assertion that Defendant was able to negotiate the terms of the March 2021 Transaction (Pl. Counter-56.1 ¶ 75) is thus unpersuasive.

More specifically, the terms of the July 2019 Transaction and the March 2021 Transaction align insofar as, pursuant to both, each share of WG Biotech was exchanged for approximately 50.1 shares of Y-mAbs common stock. (Def.

56.1 ¶¶ 74, 81).  While there was not a forward sale or purchase agreement in place specifying the price of Y-mAbs common stock in any future settlement, as in *Murdock* and *Sperling*, both the 2019 and 2021 Transactions exchanged Y-mAbs common stock for WG Biotech at exactly the same rate, *i.e.*, 50.1 shares of Y-mAbs common stock per one share of WG Biotech.  (Def. 56.1 ¶¶ 74, 81; Def. Opp. 11).  As Plaintiff admits, this rate "depicted the proportional interest of WG Biotech shareholders in the Y-mAbs shares constituting WG Biotech's only asset at a ratio of 50.1 to 1 — *i.e.*, 50.1 Y-mAbs shares were designated as corresponding to each WG Biotech share."  (Pl. Br. 2).

What is more, this rate was reflected in WG Biotech's 2015 Shareholder Register and remained consistent at all relevant times.  (*See* Asaro Decl., Ex. 5 (Share Registers for WG Biotech dated December 31, 2015; December 31, 2016; December 31, 2017; December 31, 2018; and March 2019); *see also* Pl. Br. 2-3 (stating that in May 2019, JWW bought out the interests of WG Biotech's minority shareholders at a ratio of 50.1:1 — "the same ratio depicted on the WG Biotech Shareholder Registers"), 3-4 (stating that the March 2021 Transaction involved an exchange "reflecting the same 50.1:1 ratio at which the Smallholders had previously exchanged their WG Biotech shares for Y-mAbs shares[.]")).  The logical inference is that the share exchange rate for the March 2021 Transaction was predetermined by JWW, without involvement or input from Defendant.  In other words, the March 2021 Transaction was governed by

the 50.1:1 ratio, which was set in 2015, and not the $35.30 closing Y-mAbs share price.[12]

*Third*, while the Exchange Agreement was signed by Defendant voluntarily and shortly before the March 2021 Transaction was executed, certain provisions of the Exchange Agreement evince that Defendant was not in a position to benefit from insider speculation. In particular, the Court notes that the dollar value of Y-mAbs shares was excluded from the terms of the Exchange Agreement. That is, the Exchange Agreement makes no mention of the price at which the shares of WG Biotech would be traded for the shares of Y-mAbs other than briefly referencing the then-current value per share of Y-mAbs as of the signing of the Exchange Agreement. (Gad Decl., Ex. 6 (Exchange Agreement) at 1).

Plaintiff's arguments for finding the March 2021 Transaction to be a qualifying "purchase" are unavailing. As a threshold matter, Plaintiff's opening brief in support of his motion for summary judgment assumed that the March 2021 Transaction was indisputably a "purchase," analyzing only what date should be used as the date on which Defendant's Section 16(b) "purchase" occurred. (Pl. Br. 9 (citing *Blau* v. *Ogsbury*, 210 F.2d 426, 427 (2d Cir. 1954))).

---

[12]    On this point, as WG Biotech's Form 4 reporting the July 2019 Transaction makes clear, certain shareholders of WG Biotech exchanged 10,781 shares of WG Biotech for 540,105 shares of Y-mAbs common stock. (*See* Tauber Aff., Ex. 8). Accordingly, in that transaction, every share of WG Biotech was worth 50.1 shares of Y-mAbs, and yet the closing sale price of Y-mAbs common stock at the time of the July 2019 Transaction was $22.95. (*See id.*). In the March 2021 Transaction, Defendant also exchanged his WG Biotech shares for Y-mAbs shares at a 50.1 to 1 ratio, yet the closing price of Y-mAbs stock at the time of that transaction was $35.30. (*See* Gad Decl., Ex. 3C at 3).

In so doing, Plaintiff eschewed any analysis as to congressional intent, and, for that matter, ignored *Kern County* and its progeny entirely.  (*Id.* at 8-9).

Plaintiff first argued that the March 2021 Transaction is a "purchase" under Section 16(b) in his brief in opposition to Defendant's motion for summary judgment.  (Pl. Opp. 10-12).  There, Plaintiff contends that the borderline transaction exception does not apply to the March 2021 Transaction because, in Plaintiff's view, the March 2021 Transaction is not sufficiently "unorthodox"; in support, Plaintiff argues that the March 2021 Transaction was voluntary, and that Defendant was not an "atypical insider."  (Pl. Opp. 12).  However, as discussed above, the Court need not find that both *Kern County* criteria are present to engage in a congressional-intent-based analysis of whether the transaction at issue lends itself to insider abuse of access to inside information.  The Court thus rejects Plaintiff's argument.

Plaintiff also argues that the March 2021 Transaction is a Section 16(b) "purchase" because "Gad voluntarily agreed to sell his WG Biotech shares in exchange for Y-mAbs shares and he negotiated the timing and terms of that exchange."  (Pl. Reply 9).  However, for the reasons described above, the record does not reflect any ability on the part of Defendant to negotiate (much less any actual negotiation of) the terms of the March 2021 Transaction; to that end, the Court has no reason to believe that JWW would have agreed to execute the March 2021 Transaction upon any terms other than those JWW dictated. Further, the simple fact that Defendant agreed to execute the March 2021 Transaction does not endow him with the "opportunity to speculate on the

33

basis of [his] inside information." *Sperling*, 2012 WL 1038653, at *5. Accordingly, the Court is unmoved by Plaintiff's argument.

Ultimately, because Defendant could not have manipulated the terms of the March 2021 Transaction to be more favorable to him, the Court finds that that the March 2021 Transaction was not a "purchase" under Section 16(b). Classifying the March 2021 Transaction as a "purchase" would not "serve[] the congressional purpose of curbing short-swing speculation by corporate insiders," as, in agreeing to the March 2021 Transaction, Defendant was unable to exploit any inside information he possessed. *Gibbons*, 703 F.3d at 601 (internal quotation marks omitted). In other words, Defendant was not in a position to perpetuate "the evil which Congress sought to prevent [with Section 16(b)]." *Kern*, 411 U.S. at 594. Accordingly, the Court finds that Section 16(b) liability does not attach to Defendant for the challenged transactions, and grants summary judgment in favor of Defendant.

### 2. Defendant Is Exempted from Liability by Operation of SEC Rule 16a-13 Because Defendant Remained a Beneficial Owner of the Y-mAbs Stock[13]

In addition to the whether the March 2021 Transaction constituted a "purchase" for Section 16(b) purposes, the parties also dispute whether the March 2021 Transaction is exempt from Section 16(b) liability pursuant to SEC

---

[13]    In Plaintiff's motion for summary judgment, Plaintiff argues that the March 2021 Transaction is not exempt under SEC Rule 16a-9(b), which renders exempt transactions, in relevant part, that result in "[t]he acquisition of rights ... pursuant to a pro rata grant to all holders of the same class of equity securities[.]" 17 C.F.R. § 240.16a-9(b). While Defendant cited the Rule 16a-9(b) exemption in his Answer as an affirmative defense to Section 16(b) liability (Gad Answer ¶ 24), the Court does not address this exemption here because Defendant does not argue its applicability in his motion for summary judgment (*see generally* Def. Br.).

Rule 16a-13. (*See, e.g.*, Pl. Br. 18-19; Def. Br. 20). For the reasons set forth below, the Court finds that Defendant is exempt from Section 16(b) liability under Rule 16a-13 because he retained beneficial ownership of and pecuniary interest in his holdings of Y-mAbs common stock both before and after the March 2021 Transaction.

As previously noted, Rule 16a-13 exempts from Section 16(b) liability any acquisition that effects "only a change in the form of beneficial ownership without changing a person's pecuniary interest in the subject equity securities" (the "16a-13 Exemption"). (Def. Br. 20 (quoting 17 C.F.R. § 240.16a-13)).[14] "Rule 16a-1, the SEC regulation implementing Section 16(b), defines 'beneficial owner' as 'any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities[.]'"[15] *Donoghue* v. *Smith,*

---

[14]    As Plaintiff reminds the Court (*see* Pl. Br. 17), in August 2022, the Court denied Defendant's motion to dismiss on the basis that

> Defendant's argument under Rule 16a-13 relies almost exclusively on documents that the Court cannot consider in resolving his motion. For example, to support his claim that "[a]ll shares of Y-mAbs common stock held by WG Biotech were earmarked" for each investor in WG Biotech, Defendant cites to the Shareholder Registers. Similarly, as evidence of the purported fact that "GAD Enterprises had the unfettered right to receive its *pro rata* portion of the proceeds from any sale of the Y-mAbs shares held by WG Biotech[,]" Defendant again points to the Shareholder Registers, as well as the Shareholders Agreement. Neither of these documents, however, is properly before the Court, and thus the Court cannot find that Defendant had an indirect pecuniary interest in the Y-mAbs shares based on those records.

(Dkt. #37 at 19-20 (citations omitted)). Because the Court is now able to consider these documents in resolving the instant motion, it is able to "find that Defendant had an indirect pecuniary interest in the Y-mAbs shares based on those records." (*Id.*).

[15]    Technically, there are two definitions of "beneficial owner" under SEC regulations. The first definition is utilized to determine who is a ten-percent beneficial owner, and therefore a statutory insider. 17 C.F.R. § 240.16a-1(a)(1). The second definition, which

No. 21 Civ. 4811 (JMF), 2022 WL 1225338, at *4 (S.D.N.Y. Apr. 26, 2022)

(citations omitted) (quoting *Feder* v. *Frost*, 220 F.3d 29, 33 (2d Cir. 2000)).

Relatedly, Rule 16a-1 defines "pecuniary interest" as "the opportunity, directly

or indirectly, to profit or share in any profit derived from a transaction in the

subject securities." 17 C.F.R. § 240.16a-1(a)(2)(i).

Because Rule 16a-13 does not itself provide guidance as to what kinds of

transactions qualify for the 16a-13 Exemption — *i.e.*, circumstances in which a

shareholder retained his beneficial interest in a security before and after a

particular transaction — courts in this District have sought guidance

elsewhere. Some courts have looked to industry treatises for direction. *See,*

*e.g.*, *Chechele* v. *Standard General L.P.*, No. 20 Civ. 3177 (KPF), 2021 WL

2853438, at *8 (S.D.N.Y. July 8, 2021) (citing PETER J. ROMEO & ALAN L. DYE,

SECTION 16 DESKBOOK 96 (Winter 2012) (hereinafter, "Romeo & Dye") at 300

(referring to "(i) a distribution of shares from a trust to an insider-beneficiary of

the trust and (ii) a distribution of securities from a limited partnership to its

general partner" as situations where the 16a-13 Exemption applies)); *Smith*,

2022 WL 1225338, at *4 (citing Romeo & Dye at 553-54 (indicating that

changes from indirect to direct ownership constitute changes in the form of a

party's beneficial ownership, but do not change the party's pecuniary interest,

---

applies for purposes of the short-swing profits provisions of Section 16(b), provides that
the term "beneficial owner" means "any person who, directly or indirectly, through any
contract, arrangement, understanding, relationship or otherwise, has or shares a direct
or indirect pecuniary interest in the equity securities[.]" *Id.* § 240.16a-1(a)(2). Because
the parties do not dispute that Defendant was an insider, only the second definition is
relevant to the instant matter. (*See* Def. Br. 20 & n.7; Pl. Br. 17-18).

and as such, qualify for the 16a-13 Exemption)).  Courts have also found persuasive certain SEC publications.  *See, e.g.*, *Standard General*, 2021 WL 2853438, at *8 (quoting *Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Exchange Act Releases Nos. 34-37260, 35-26524, 61 Fed. Reg. 30376, 30385 n.117 (June 14, 1996) (hereinafter, "*Ownership Reports and Trading by Officers*")); *Smith*, 2022 WL 1225338, at *4 (same).

A brief review of cases in which courts have addressed the applicability of the 16a-13 Exemption is also informative.  Broadly speaking, where a transaction merely changes a holder's "form of beneficial ownership" but does not change the holder's pecuniary interest in the subject securities, courts have concluded that the transaction qualifies for the 16a-13 Exception.  *See, e.g.*, *Smith*, 2022 WL 1225338, at *4; *Donoghue* v. *Novastar Fin. Inc.*, No. 04 Civ. 6857 (KMW), Dkt. #33 at 23 (S.D.N.Y. Mar. 27, 2006) (indicating that defendant's transfer of shares from joint account to personal account qualified for 16a-13 Exemption).  For instance, courts in this District have found that "distributions of equity securities from an employee benefit plan to an insider participant" qualify for the 16a-13 Exemption, in view of the fact that they involve "a mere change in the form of beneficial ownership from indirect to direct where the securities previously had been attributed to the insider."  *See, e.g.*, *Smith*, 2022 WL 1225338, at *4; *Standard General*, 2021 WL 2853438, at *8.

Conversely, where a transaction implicates a change in both a holder's form of beneficial ownership and pecuniary interest, courts have concluded that the 16a-13 Exception does not apply.  For example, in *Chechele* v. *Standard General L.P.*, the defendants conducted a series of transactions "separately and independently of one another, at slightly different times, [] with different counterparties."  2021 WL 2853438, at *9 (internal quotation marks omitted) (alteration in original).  The Court held that the plaintiff had plausibly pleaded that the defendants' pecuniary interests changed over the course of these transactions, due to the existence of gaps in time between the transactions in which defendants "had neither direct nor indirect beneficial ownership over the stock."  *Id.* at *10.  In another case, *Donoghue* v. *Novastar Financial Inc.*, the defendant purchased a certain number of a company's shares through one account and subsequently sold the same number of that company's shares out of another account; the court found that these transactions, unlike transferring the same shares directly between the two accounts, did not reflect a "mere change in the form of ownership of the securities involved," thus rendering the 16a-13 Exemption inapplicable.  No. 04 Civ. 6857 (KMW), Dkt. #33 at 22-23.

Here, it is undisputed that Defendant had a pecuniary interest in his holdings of Y-mAbs common stock following the March 2021 Transaction.  (*See* Def. Br. 2-3 (arguing that the March 2021 Transaction "simply brought about a change in the form of [Defendant's] beneficial ownership of the securities ... leaving his pecuniary interest unchanged"); Pl. Br. 18-19 (arguing that

38

Defendant's pecuniary interest in the Y-mAbs stock is governed by SEC Rule 16a-1(a)(2)(iii) and thus that Defendant only had a pecuniary interest in the Y-mAbs stock after the March 2021 Transaction)). The availability of the 16a-13 Exemption accordingly depends on whether Defendant had a pecuniary interest in the Y-mAbs securities he held indirectly through WG Biotech — "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in [those Y-mAbs] securities" — between 2015, the date of his initial investment, and the March 2021 Transaction. *Standard General*, 2021 WL 2853438, at *9 (quoting 17 C.F.R. § 240.16a-1(a)(2)(i)).

The Court finds that Defendant could indeed "profit or share in any profit derived from a transaction in [the Y-mAbs] securities [that he held through WG Biotech]" since 2015, and thus that he had a pecuniary interest in those Y-mAbs shares before and after the March 2021 Transaction, making the transaction eligible for the 16a-13 Exemption. 17 C.F.R. § 240.16a-1(a)(2)(i). First, taking the Shareholders' Agreement at face value, Defendant was entitled to profits from Y-mAbs shares held by WG Biotech from 2015, when the Shareholders' Agreement was executed, through the March 2021 Transaction, when WG Biotech no longer held any Y-mAbs shares. (*See* SA ¶ 16.1). More specifically, Defendant (through GAD Enterprises) was entitled to 100% of the *pro rata* portion of the proceeds from any sale of Y-mAbs shares by WG Biotech. (Def. 56.1 ¶ 27; Pl. Counter-56.1 ¶ 27). Further, Defendant (again, through GAD Enterprises) had the ability to demand distribution of 33.33% of any dividends Y-mAbs paid to WG Biotech. (Def. 56.1 ¶ 25; Pl. Counter-56.1

¶ 25; SA ¶ 16.1).  While Y-mAbs never paid any dividends to WG Biotech, this does not change the fact that Defendant was entitled to the contracted-for portion of those dividends; Plaintiff acknowledges as much.  (Def. 56.1 ¶ 26; Pl. Counter-56.1 ¶ 26).  These provisions of the Shareholders' Agreement alone bestow on Defendant a pecuniary interest in the Y-mAbs shares extending back to 2015.

Beyond the plain text of the Shareholders' Agreement, the relevant caselaw in this District supports the Court's conclusion as well.  As the Romeo & Dye treatise indicates, and as several courts in this District have found, "a distribution of shares from a trust to an insider-beneficiary of the trust" constitutes an exempt transaction under Rule 16a-13.  *Standard General*, 2021 WL 2853438, at *8 (citing Romeo & Dye at 300).  Much like a beneficiary of a trust benefits from profits realized by the trust through the trust's investments, Defendant here was entitled to benefit from profits realized by WG Biotech from its sale of Y-mAbs common shares and from Y-mAbs dividends.  (Def. 56 ¶¶ 25, 27).  Similarly, Defendant's continued entitlement to profits realized from Y-mAbs shares held by WG Biotech resembles "distributions of equity securities from an employee benefit plan to an insider participant … where the securities previously had been attributed to the insider."  *Smith*, 2022 WL 1225338, at *4; *see also Standard General*, 2021 WL 2853438, at *8 (both quoting *Ownership Reports and Trading by Officers*).  The Y-mAbs shares held by WG Biotech were specifically attributed on a *pro rata*

basis to each of WG Biotech's investors, including GAD Enterprises.  (Def. 56.1 ¶ 41).

Above all, this Court is guided by the principle that "a mere change in the form of beneficial ownership from indirect to direct where the securities previously had been attributed to the insider" qualifies for the 16a-13 Exemption.  *See Smith*, 2022 WL 1225338, at *4; *Standard General*, 2021 WL 2853438, at *8; *see also Novastar*, No. 04 Civ. 6857 (KMW), Dkt. #33 at 22-23 (noting that, if the defendant had "simply moved [] shares from his joint account to his [individually controlled] accounts," the transaction would likely be exempt under Rule 16a-13).  Applying that logic to the instant case, Defendant effectively moved his Y-mAbs shares from one account to another when he transferred them from indirect ownership through WG Biotech shares to direct ownership through GAD Enterprises.  The facts of the instant matter fit comfortably within the contours of this District's articulation of the 16a-13 Exemption.

Plaintiff argues, in opposition, that SEC Rule 16a-1(a)(2)(iii) forecloses Defendant from taking advantage of the 16a-13 Exemption.  (Pl. Opp. 18). That rule provides in relevant part that

> [a] shareholder shall not be deemed to have a pecuniary interest in the portfolio securities held by a corporation or similar entity in which the person owns securities if the shareholder is not a controlling shareholder of the entity and does not have or share investment control over the entity's portfolio[.]

17 C.F.R. 240.16a-1(a)(2)(iii).  The Court is not convinced that this Rule is applicable to the instant case.[16]  Importantly, the Second Circuit has indicated that an insider "hav[ing] or shar[ing] investment control" refers to "a shareholder with the power to exercise control over the corporation by virtue of his or her securities holdings."  *Feder*, 220 F.3d at 34; *see also Mercer* v. *Gupta*, 880 F. Supp. 2d 486, 493 (S.D.N.Y. 2012) (defining investment control as "possessing the direct or indirect power to direct or cause the direction of the management and policies of a person's (or fund's) investments").  Here, certain provisions of the Shareholders' Agreement suggest that Defendant had some at least some substantive investment control over WG Biotech's portfolio. For example:

- Any agreement made "between [WG Biotech], on one side[,] and one or more of the parties or anyone closely related on the other side, ... always [had to] be approved by the other party."  (SA ¶ 7.1).

- Either JWW or Defendant was "entitled to transfer its shares in entirety or in parts," but each was required to first offer those shares to the second party in writing, detailing the price offered by a third party to the selling party.  (SA ¶ 8.1).  If the second party did not respond to the selling party within one month of receiving the offer, the selling party could "sell their capital shares to a third party ... within the range of +/- 10%" of the original price offered by such a third party.  (*Id.*).

- If either JWW or Defendant had "the option of selling all or parts of their capital shares to an independent third party, the other party ha[d] the right to demand[] that

---

[16]    As Defendant notes, "this rule was adopted as a safe harbor, and not as a definition of pecuniary interest, and in any event, must be raised by a defendant since it is an affirmative defense."  (Def. Opp. 18-19 (first citing *Feder ex rel. Ivax Corp.* v. *Frost*, 220 F.3d 29, 33 (2d Cir. 2000); and then citing *Mercer* v. *Gupta*, 712 F.3d 756, 759 (2d Cir. 2013))).

the third party also buys a proportionate part of th[at] [second] party's capital shares on identical terms." (SA ¶ 10.1). If the third party was not interested in acquiring the second party's shares, "the selling capital owner [had to] cancel the sale of their capital shares." (*Id.*).

▪ The Shareholders' Agreement was "irrevocable by both parties and remain[ed] unchanged in force until there [was] an agreement between the parties to terminate or amend it, or until a party becomes the owner of all the shares." (SA ¶ 18.1).

Taken together, these provisions indicate that JWW and Defendant had significant oversight over each other with respect to how their capital shares of each other's companies could be transferred or otherwise allocated from the execution of the Shareholders' Agreement through the March 2021 Transaction. While Defendant was not involved in JWW's decision to undertake the July 2019 and March 2021 Transactions, by virtue of the fact that Defendant did not control WG Biotech (*see* Pl. 56.1 ¶ 8; Def. Counter-56.1 ¶ 8), the terms of the Shareholders' Agreement put Defendant on the same playing field as JWW with respect to Defendant's control over his Y-mAbs shares while the Shareholders' Agreement remained in effect (*see* SA ¶¶ 7-10 (outlining terms to which both parties were bound with respect to transferring or otherwise disposing of Y-mAbs shares)); *see also supra* Background Section B.2 (listing examples of these terms)). The governing terms of the Shareholders' Agreement indicate that Defendant had, if not the "direct power," at the very least, the "indirect power to direct or cause the direction of the

43

management" of WG Biotech's investments in Y-mAbs. *Mercer*, 880 F. Supp. 2d at 493.

For all of these reasons, the Court finds that the 16a-13 Exemption applies to the March 2021 Transaction, and that Section 16(b) liability does not attach to Defendant's trades in the six-month periods preceding and following that transaction. The 16a-13 Exemption thus provides a separate basis upon which this Court may grant Defendant's motion for summary judgment.

## CONCLUSION

For the reasons detailed above, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for the same.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    August 5, 2024
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge